## Wright Trust

*Robert L. Walker* and *Robert B. Dornhoffer*, for petitioners.

*Gordon R. Miller*, guardian ad litem.

*Max B. Maloney*, for Commonwealth, as parens patriae.

THOMAS, J., July 7, 1967.—In this case, the orphans' court is asked by petition to assume jurisdiction of a trust inter vivos and "exercise its powers of equity by making reformation of said trust agreement and thus enable your petitioners as trustees to vote in favor of" a proposed merger of the Jamestown Telephone Corporation, Meadville Telephone Company and Home Telephone Company of Ridgway with Mid-Continent Telephone Corporation, an Ohio corporation.

This petition was filed by the present trustees under the trust. A citation was issued to all interested parties directing them to show cause why the prayer of the petition should not be granted, and, at the same time, Gordon R. Miller, Esq., a member of the bar, was appointed guardian ad litem to represent the in-

terests of certain minor beneficiaries as well as "any unborn child of Lois E. DeLong Avery".

After preliminary argument, the court ordered that a hearing be held:

(1) To determine whether the orphans' court has jurisdiction, since it developed at the preliminary argument that the facts necessary to said jurisdiction were not recited in the petition;

(2) To ascertain what effect, if any, the failure to permit the trust stock to be voted in favor of the merger has had, or will in the future have, upon the financial condition of the companies involved and, as a result, upon the trust res;

(3) To determine in what way, if any, the merger will affect the future of the companies involved.

It is necessary to review the facts relating to this trust, the reasons given for the proposed merger, and the effect of merger or nonmerger upon the companies involved and the benficiaries of the trust.

The trust was executed on September 10, 1945, by John H. Wright, Agnes Wright Kane and Lloyd C. Wright, and was "made irrevocable and of perpetual duration". (Paragraph Eighth.)

The facts devloped show clearly that Meadville Telephone Company, Jamestown Telephone Corporation, and the Home Telephone Company of Ridgway (hereinafter referred to as "the companies"), were the result of the industry, aggressiveness and imagination of John H. Wright. The fourth company named in the trust, Peoples Telephone Corporation of Butler, was merged with another company about a year ago, with the trustees voting the trust's two percent of the stock against the merger because, as trustee Cravens testified, "we interpreted the trust as preventing us from selling". The companies were created by John H. Wright by merger with and acquisitions of smaller telephone companies. In Butler, Pa., and Jamestown,

N. Y., Wright was competing with lines of the Bell system, and, as a result of that competition, and a lengthy lawsuit over tolls, developed a bitter and unyielding hatred of the Bell system. However, he apparently had an almost obsessive fear that the Bell system might someday acquire, or attempt to acquire, the companies owned by him, and he wanted to prevent this. He also wanted to protect the employes of his companies who had worked with and for him during the growth of the companies. It was at least partly to accomplish these two objectives that he set up the trust here involved, which, in the first paragraph, spells out the purposes and aims of the trust, as follows:

"First: To fulfill the purposes and aims of the trust which are the following:

"(a) To provide for the beneficiaries designated herein.

"(b) To assure the continued operation of the communication systems in the territories including and surrounding Jamestown, N. Y., and Meadville, Ridgway and Butler, Pa., as local and independent enterprises.

"(c) To benefit the above named communities by having their communications systems managed and staffed by inhabitants of the general locality.

"(d) To provide a bulwark against monopoly control of the communications systems of the country.

"(e) To remove from the reach of speculators the ownership of the communications systems and to assure financially conservative administration of these systems to the end that they may best serve the inhabitants of said communities.

"(f) To protect the employees of said communications systems and to assure them of employment in their home territory under conditions established by locally responsible management".

To assure these purposes and aims further, he provided in paragraph fourth (b):

"Fourth: . . .

"(b) . . .; they shall at all times during the life of the trust retain ownership and control either directly or by means of an intermediate holding device such as John H. Wright, Inc., of the voting stocks of the Jamestown Telephone Corporation, Meadville Telephone Company, Home Telephone Company of Ridgway, and Peoples Telephone Corporation of Butler, both now held and hereafter acquired by the trustees or their intermediate holding devices. The trustees shall not use any intermediate holding device not wholly owned by them and shall not dispose of any proprietary interest in any holding device so long as any of the above voting stocks are held therein. . . . Notwithstanding the foregoing provisions of this subparagraph, if the Individual Trustees, in their discretion, consider that it is wise to acquire more voting stocks of the above named telephone companies, in order to assure control thereof from time to time, they may purchase such additional voting stocks with the proceeds of the sale of property in which the trust has an interest other than the voting stocks of said telephone companies, and, if such proceeds are insufficient, then the trustees may borrow money and pledge the voting stocks so purchased as security for such borrowings, and, if unable to pay such loan when due, may sell or cause to be sold the securities so pledged using the proceeds therefrom to pay off said loan and returning the balance, if any, to the trust as part of the trust property. Notwithstanding anything to the contrary herein contained, the individual trustees shall have the right and power to sell a portion of the voting stocks of the foregoing telephone corporations under the following circumstances only:

"In the event said individual trustees hold and own more than 55% of the voting stock of any of said corporations and it is deemed advisable to acquire by purchase additional stock in one of the other of said telephone corporations then the said individual trustees are authorized and permitted to sell, for an adequate consideration, shares of the voting stock of the corporations in which they own more than 55% of the voting stock and use and apply the proceeds therefrom to the purchase of the voting stock of any of the other said corporations, but any such sale shall only be made and the proceeds therefrom shall only be used for the purpose of acquiring and purchasing stock of any of the said telephone corporations and in no event shall any of such stock in any of such corporations be sold so as to reduce the ownership by the individual trustee below 55% of the total voting stock outstanding".

At the time of its creation, there was deposited in the trust 53 percent of the stock of the Jamestown Telephone Corporation, 24.7 percent of the Meadville Telephone Company, and 64 percent of the Home Telephone Company of Ridgway. Sale of additional stock to raise new capital "diluted" these holdings so that the trust now owns 20 percent of the stock of the Jamestown Telephone Corporation, 22 percent of the Home Telephone Company of Ridgway, and 19 percent of the Meadville Telephone Company. The companies are all sound financially, and there is no evidence that the failure to merge with Mid-Continent would seriously impair their financial condition, at least within the near future. The trustees, however, feel that merger is necessary because:

(1) Additional financing required for expansion to keep pace with the service expected by the public and being rendered by other systems, especially Bell, will be easier and less expensive to secure, and, more importantly, can be done much sooner.

Without merger, the financing will be possible but at higher interest rates, expansion will be twice as slow, and the up-to-date service required to compete will be delayed.

(2) Merger will give the companies the benefit of more staff, engineers and experienced skilled technical management personnel by pooling the talents of the merged companies.

(3) Merger will benefit the employes by improved fringe benefits and stock purchase plans.

(4) The modern trend is merger and "at some point of time merger is inevitable". (See testimony of Frederick Heft, vice president of the companies.)

(5) Under merger, the beneficiaries of the trust will receive twice as much income. (See testimony of trustee Rogerson.)

The officers and directors of the companies apparently decided that merger was necessary about one year ago and started investigating the available possibilities. The merger with Mid-Continent appeared to them to be the most advantageous to the companies. Without going into all the details, Mid-Continent proposes that Jamestown Telephone Corporation, Meadville Telephone Corporation and the Home Telephone Company of Ridgway would merge with and into Mid-Continent, the surviving corporation. The outstanding shares of the companies shall be converted into shares of Mid-Continent. Each of the companies will organize wholly-owned subsidiaries and transfer all assets to the subsidiary so that the sole asset of the companies will be the stock of the subsidiaries (which will also become subsidiaries of Mid-Continent as a result of the merger). So far as the issues before the court are concerned, the relevant result of the merger will be that Mid-Continent stock will be substituted for stock of the companies as trust property and the trustees will effectively relinquish any control of the companies

which they have by virtue of the stock presently held by the trust. Mid-Continent, in other words, will control the future destiny of John Wright's companies as well as their personnel.

Turning now to the circumstances of this case, we have already set forth the reasons given by the trustees for desiring authority to vote in favor of the merger, and it is not necessary to repeat them here. Some of these reasons standing alone would not justify deviation from the trust. For example, the fact that the life beneficiaries will receive more income is not alone sufficient: Restatement of Trusts 2d §167, Subsection (1)b. Deviation is authorized only where "compliance would defeat or substantially impair the accomplishment of the purposes of the trust", and deviation is "necessary to carry out" such purposes.

In this case, the *first* purpose mentioned in the trust instrument is "to provide for the beneficiaries designated herein". (Paragraph First (a) of the trust agreement). We think that this must be considered the primary purpose of the trust, not only because it is mentioned first but because the very nature of the dispositive provisions indicates a complete plan to protect and benefit the objects of the settlor's bounty and concern. So that, while standing alone, more income to the beneficiaries might not justify a deviation (although under extreme circumstances not now present here, it may) at this time, the eventual impact of non-merger upon the beneficiaries is of extreme importance and cannot be ignored.

In this connection, the court was most impressed by the testimony that "at some point in time merger is inevitable". The court is aware of the modern trend of companies to merge in order to keep pace with modern technology and frequently to survive. The evidence shows that, in the telephone "trade", the word "independent" used in paragraph first (b) of the trust

means companies outside the Bell system. The number of independent companies, by mergers and consolidations, has been reduced from 10,000 at the end of World War II to about 2,300 at present. This is undoubtedly due to the fact that the smaller independent phone companies find it increasingly difficult to finance new construction, acquire new equipment, hire more skilled personnel and meet bond maturities. These problems are now confronting John H. Wright's companies, and, without merger, the companies will find it more and more difficult to raise capital, render service comparable to other systems, modernize and expand, secure and retain skilled personnel and meet debt obligations. This is not to say that the companies are not now financially sound. On the contrary, under the evidence, the court could find that there is no present danger of "defeating or substantially impairing the accomplishment of the purpose of the trust" and that merger must await the immediate necessity. We feel that this would be short-sighted and unrealistic. Because of their present sound financial condition, the companies were able to negotiate a favorable and advantageous merger plan. In the future, if the "inevitable merger" is forced upon them, the terms may, and probably will, be determined by others, and, therefore, be less acceptable, if not entirely unfavorable. The end result may well then be to "defeat or substantially impair the accomplishment of" the main purpose of the trust, i.e., to provide for the beneficiaries.

There are also other considerations which prompt the court to permit deviation from the terms of the trust. The court is satisfied that John H. Wright intended to prevent the acquisition of any of the companies by the Bell system. The broader language of the trust, however, shows a clear intent to have the companies remain not only *independent* but also *local*.

This is apparent from the use of such words in paragraph first (b), as well as the use of the words in connection with the employes of the companies in paragraph first (c), (i.e., "systems managed and staffed by inhabitants of the general *locality*"), *and paragraph* first (f) (i.e., "to assure them (employes) of employment in their *home* territory under conditions established by *locally* responsible management"). *Presently,* then, a vote in favor of the merger would be contrary to these purposes. From a long range point of view, however, compliance with that provision of the trust requiring the trustees to retain ownership and control of the voting stock of the companies will have the same effect, if we believe, as we do, that, at some point of time, merger is inevitable, and meanwhile it will become increasingly difficult and more expensive to secure capital for added services, equipment and expansion. Delayed merger might force these companies into the Bell system, whereas, according to J. Russell Rogerson, Esq., one of the trustees and the attorney who drafted the instrument, merger now with Mid-Continent would more surely prevent acquisition by Bell. Here, therefore, deviation from the terms of the trust will have the effect of at least preserving that purpose of settlor, Wright.

So far as the employes of the companies are concerned, the evidence was that the companies are and have been hiring skilled personnel outside of the locality who then become "inhabitants" of such locality. There is, of course, the possibility that the employes will not all be assured of employment in their home territory under conditions established by local management. However, future merger will have the same effect, and, in fact, would undoubtedly affect the employe even more adversely if the companies are forced into a merger not of the companies' choosing. At least, the present merger will, according to the officers of

the companies, enable the employes to gain by better fringe benefits and stock purchase plans. Furthermore, the merger plan recites that "it is anticipated that (the companies) will have the same officers, directors and employees". While apparently not binding upon Mid-Continent, this, at least, indicates that there is no plan to replace local employes, and no reason appears why Mid-Continent would do so.

In short, and, in summary, what we are here holding is that, although compliance with the terms of the trust would not now defeat or substantially impair the accomplishment of the purposes of the trust, deviation is necessary to prevent the future defeat or substantial impairment of the primary purpose of the trust and to carry out the other purposes insofar as is possible under the circumstances. Compare Lehigh University v. Hower, 159 Pa. Superior Ct. 84.

We conclude, therefore, that circumstances presently exist which were not anticipated by John H. Wright, and for which, if he had known and anticipated them, he would undoubtedly have made provisions. For this reason, the court must, as far as may be, occupy his place and do what we feel he would have dictated had he anticipated the circumstances.

Because this opinion will undoubtedly have far-reaching consequences so far as this trust is concerned, and may be cited as precedent in other cases, we have felt compelled to treat each issue separately and at some length. We also wish to make it crystal clear that our decision here is not to be construed as a policy which will permit indiscriminate deviations from the intentions expressed by those who create trusts and make wills. We limit our opinion to the facts and the unusual circumstances which exist in this case. We also wish to point out that all of the beneficiaries under the trust were served with the citation issued in this case, and all those who were

sui juris have filed of record waivers of their right to answer the citation, consenting to the exercise by the court of its powers of equity to enable the trustees to vote in favor of the merger, and releasing the trustees from any and all liability arising from their participation and affirmative voting in favor of said plan. Those who were minors and persons not in being were ably and forcefully represented by the guardian ad litem who, in spite of his personal opinion that the merger was in the best interests of all of the beneficiaries, presented, at the request of the court, contra legal arguments so that the court would have the benefit of arguments on both sides of the issues involved.